[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 181.]

MEIJER, INC., APPELLANT, *v.* MONTGOMERY COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as *Meijer, Inc. v. Montgomery Cty. Bd. of Revision*, 1996-Ohio-223.]

*Taxation—Real property valuation—Appeal to Board of Tax Appeals—Board's decision affirmed by court when reasonable and lawful.*

(No. 95-510—Submitted November 30, 1995—Decided March 5, 1996.)

APPEAL from the Board of Tax Appeals, Nos. 93-M-731, 93-M-732 and 93-M-733.

————————————

{¶ 1} In March 1993, Meijer, Inc., appellant, filed complaints with appellee Montgomery County Board of Revision ("BOR") for tax year 1992, relating to the assessment of real property at three Meijer store locations in Montgomery County. The three school districts involved apparently filed counter complaints supporting the auditor's valuations. The BOR affirmed the county auditor's valuations.

{¶ 2} Meijer appealed the decisions of the BOR to the Board of Tax Appeals ("BTA"). By stipulation of the parties, only the value of the property located in the Northmont City School District was to be heard before the BTA. The parties further stipulated that the other two properties, located in the West Carrollton Public School District and the Mad River Local School District, would be valued at a percentage of the true value determined for the property located in the Northmont City School District.

{¶ 3} The Northmont City School District real property owned by Meijer consists of 41.826 acres located in the southeast quadrant of the intersection of I-70 and State Route 48 in Englewood, Ohio, about fifteen minutes from downtown Dayton. The primary building situated on the real property is a 200,937 square foot building (195,000 square feet rentable), which was finished in 1991. Also situated

on the real property is a 1,604 square foot convenience market/gas station, which was also finished in 1991.

{¶ 4} The primary building has a concrete foundation with steel frame construction and tilt-up concrete walls. The floor coverings are tile and carpet and the ceiling is exposed beam, except for a portion that has suspended acoustical tile. The primary building also contains a mezzanine area of approximately 5,120 square feet served by an elevator. In addition, the site is improved by fencing, approximately 800,000 square feet of asphalt paving, and 25,200 square feet of concrete paving.

{¶ 5} Each of the three parties represented before the BTA, Meijer, the BOR, and Northmont City School District Board of Education, presented the testimony of an appraiser. Meijer's appraiser, Ronald P. Davis, with the Pickering Valuation Group, presented three approaches to fair market value. Of the three approaches to fair market value, Davis stated that he placed the greatest importance on the income approach. Davis, along with the other appraisers, found the highest and best use of the property to be its present use for retail sales.

{¶ 6} For his income approach, Davis presented five comparable leases. His comparables were a shopping center in Bellefontaine, Ohio, a shopping center in Wilmington, Ohio, and three Kohl's stores in Columbus, Ohio. The lease rates for these properties ranged from $4.34 to $4.77 per square foot. After making some adjustments, Davis estimated the range of rental values to be $4.34 to $4.53 per square foot. He chose a gross market rent of $4.50 per square foot for the Meijer property, plus an estimated $48,000 per year for the gas station. Davis' potential gross income was $925,500 per year. From this amount he deducted a vacancy and credit allowance of $46,275 and expenses of $145,941 per year, leaving a net operating income of $733,284. Using the band of investment method and the debt coverage ratio method, Davis arrived at an overall capitalization rate of 10.3

percent. Applying the 10.3 rate to the yearly net operating income of $733,284 Davis determined a fair market value of $7,100,000.

{¶ 7} For his market data approach, Davis listed nine properties for comparison which ranged in size from a little under 66,000 square feet to a little over a 136,000 square feet. Three of the comparables were Wal-Mart stores located in Oskaloosa and Boone, Iowa and Midland, Texas. The fourth property was a K-Mart in Bay City, Texas. The remaining five properties were Kohl's stores in Columbus, Ohio. The Iowa and Texas properties yielded $36.97 to $46.83 per square foot when sold with a lease in place, a type of sale Davis described as a net bond type lease. The five remaining Kohl's stores, which had formerly been Gold Circle Stores, had been built in the 1960s and 1970s. They were sold out of bankruptcy in late 1988-1989, at a cost which Davis estimated, after rehabilitation, to range from $27.85 to $40.84 per square foot. Using a middle range value of $33.75 per square foot plus a value of $353,000 for the gas station, Davis determined a fair market value under the market data approach of $7,133,000.

{¶ 8} For his cost approach to value, Davis valued the land at $80,000 per acre for a total land value of $3,350,000. Using cost data from Marshall & Swift, he estimated a replacement cost for the primary building of $8,079,672. The addition of a value of $400,000 for the gas station yielded a total replacement cost of $11,829,672 for the land and buildings, which equated to a cost of $60.66 per rentable square foot for the primary building. Davis then deducted physical depreciation of $286,543 and obsolescence of $4,496,359, for an estimated depreciated value for the primary building of $3,296,770. Adding back the estimated fair market value of the land and the gas station resulted in an estimated fair market value by the cost approach of about $7,050,000.

{¶ 9} To calculate the obsolescence of $4,496,359, Davis took the estimated cost per rentable square foot ($60.66) and multiplied it by the capitalization factor (0.1030) that he had used for his income approach, and determined that a building

costing $60.66 per square foot should rent for $6.25 per square foot on a triple net basis. From this amount he then deducted the $3.74 per square foot amount he had estimated as rental income under his income approach, and determined a rental shortfall of about $2.50 per square foot, for an annual rental shortfall of $487,500. He attributed this amount to obsolescence. He then deducted an annualized vacancy and commission expenses of five percent and capitalized the remainder ($463,125) at 10.3 percent for an estimated obsolescence amount of $4,496,359. Davis' calculation of obsolescence and physical depreciation totaled $4,782,902, which, when subtracted from an estimated cost of $8,079,672, resulted in an estimated depreciated fair market value for the primary building of $3,296,770.

{¶ 10} The county's appraiser was Earl P. Williams, an employee of fifteen years with Saber Systems and Service, Inc. Williams considered the three approaches to value, but only performed appraisals based on the cost and income approaches. Williams did not express an opinion of value based on the market approach because he did not find any comparable sales within the three years prior to the tax lien date.

{¶ 11} To develop his cost approach for the primary building, Williams used the Marshall Valuation Services for 1992 and estimated a cost after depreciation of $7,554,123 for the primary building with site improvements, and $181,165 for the gas station with site improvements. Williams valued the land, under a sales approach at $2,443,160, resulting in an estimated value for the land and improvements of $10,178,448.

{¶ 12} For his income approach, Williams could find no local properties that he believed would have been comparable, so he referred to a national publication of the Urban Land Institute, entitled "Dollars and Cents of Shopping Centers," for his estimate of the rental rate for the primary building. Williams estimated a rent of $5 per square foot for the primary building and $30,000 per year for the gas station. He then deducted administrative expenses of five percent

resulting in a net income of $954,617 per year. Referring to a publication entitled "The Investment Bulletin," Williams chose a capitalization rate of 9.7 percent, which, when divided into the income of $954,617 and added to an excess land value of $218,160, resulted in an estimated fair market value of $10,060,000.

{¶ 13} Because the property was essentially new, Williams concluded that the cost approach best determined the value of the property, and, thus, the fair market value was $10,178,500.

{¶ 14} The final appraiser was Edward J. Orlett, who testified on behalf of the Northmont City School District. For his cost approach, Orlett valued the land at $2,681,700. Using the Marshall Valuation Service's profile of a Class C, average discount store, Orlett determined a depreciated valued of $11,468,500 for the buildings and improvements. Adding the cost of land, Orlett estimated a total depreciated fair market value of $14,150,200 for the buildings and land.

{¶ 15} For his income approach, Orlett surveyed commercial realtors in the Dayton area and received a concensus that a retail building the size of the primary building would rent for $4.50 to $5.00 per square foot. Using a median rental value of $4.75 a square foot and a capitalization rate of 9.75 percent, Orlett determined a fair market value by the income approach of $9,867,000 for the land and buildings.

{¶ 16} Orlett did not employ the market approach because he could not find valid comparisons for this particular building. Orlett's final estimate of value was $11,580,700.

{¶ 17} The BTA accepted Williams' cost approach and found a true value of $2,443,160 for the land and $7,735,340 for the buildings and improvements, for a total true value of $10,178,500. The BTA valued the other two properties accordingly, as per the parties' stipulation.

{¶ 18} Meijer filed a notice of appeal and this case is now before this court upon an appeal as of right.

—————————————

*Fred Siegel Co., L.P.A., Fred Siegel* and *Annrita S. Johnson; Honigman, Miller, Schwartz & Cohn* and *Michael B. Shapiro*, *pro hac vice,* for appellant.

*Matthias B. Heck*, Montgomery County Prosecuting Attorney, and *Marcell N. DeZarn*, Assistant Prosecuting Attorney, for appellee Montgomery County Board of Revision.

*James R. Gorry,* for appellee Northmont Board of Education.

———————————

**Per Curiam.**

**{¶ 19}** Meijer asserts the BTA decision was unreasonable and unlawful and must be reversed. Meijer argues initially that the BTA erred by adopting a "value in use" appraisal. Meijer does not define what it means by a value-in-use appraisal. However, "use value" as defined in The Appraisal of Real Estate, (American Institute of Real Estate Appraisers, 9 Ed. 1987) 20, is:

"[T]he value a specific property has for a specific use. Use value focuses on the contributory value of real estate to the enterprise of which it is a part, without regard to its highest and best use or the monetary amount that might be realized upon its sale." (Emphasis deleted.)

**{¶ 20}** In *State ex rel. Park Invest. Co. v. Bd. of Tax Appeals* (1972), 32 Ohio St.2d 28,33, 61 O.O.2d 238,241, 289 N.E.2d 579, 582, we stated that "[s]ince the current use method of evaluation excludes, among other factors, location and speculative value which compromise market value, such current use method cannot be made the basis for valuation of real property for tax assessment purposes ***." The BTA was aware of the prohibition against accepting a value in use appraisal, stating, "'value in use' is an unconstitutional form of valuing real property in this state."

**{¶ 21}** Meijer cites no testimony from Williams, or any other witness, or any evidence, to provide a basis for its allegation that the BTA adopted a value-in-

use appraisal, rather than a value-in-exchange appraisal. Therefore, we reject Meijer's first argument.

{¶ 22} Meijer's next contention is that the BTA erred in its use of the income approach by adopting an incorrect economic rent, failing to account for vacancy and credit loss, taking too small an expense amount, and adopting an unsupported capitalization rate. In each case, Meijer contends that the amount proposed by its appraiser should have been adopted. Basically, Meijer's argument is an attempt to refute the testimony of the appraisers for the county and the school board in order to have the income approach of its appraiser adopted. This court is not a "'super' board of tax appeals." *Hercules Galion Products, Inc. v. Bowers* (1960), 171 Ohio St. 176, 12 O.O.2d 292, 168 N.E.2d 404, 405. As we stated in *Wolf v.Cuyahoga Cty. Bd. of Revision* (1984), 11 Ohio St.3d 205, 207, 11 OBR 523, 524, 465 N.E.2d 50, 52, "A great deal of appellants' argument is devoted to the rebuttal of appellees' expert's testimony. Ultimately they conclude that none of his conclusions is credible enough to be relied on by the BTA. However, such a determination is precisely the kind of factual matter to be decided by the BTA."

{¶ 23} In this case, the BTA rejected the market approach put forth by Meijer's appraiser and then stated, "We are similarly not persuaded by his income capitalization approach to value." In fact, the BTA put very little weight on the income approach, stating, "While this Board places some weight on Williams' income approach, we find the most reliable evidence of value in the present matter is presented through the cost approach."

{¶ 24} The BTA has wide discretion to determine the weight given to evidence and the credibility of witnesses before it. Its true value decision is a question of fact which will be disturbed by this court only when it firmly appears from the record that such decision is unreasonable or unlawful. *Cardinal Federal S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d

83, 336 N.E.2d 433, paragraphs three and four of the syllabus. Meijer has not established an abuse of discretion here.

{¶ 25} Meijer also argues that the BTA erred in failing to explain the basis for the income approach on which it relied. The BTA rejected Meijer's appraiser's income approach to value, stating that the "attempt to fix a market rent was based upon properties that were not truly comparable." And as we stated previously, the BTA merely placed "little weight" on William's income approach. Having basically rejected the income approach and stated that the BTA found the most reliable evidence of value to be the "cost approach," we do not believe that the BTA needed to explain more concerning the income approach.

{¶ 26} Meijer next asserts that the BTA erred because it relied on an unsupported and unlawful income-approach valuation, and therefore erroneously failed to account for obsolescence in the cost approach it adopted. Meijer is again basically asserting that its appraiser's values should have been accepted by the BTA rather than those of Williams. Meijer contends that if its appraiser's income approach had been accepted by the BTA, obsolescence could have been proven. In *Rollman & Sons Co. v. Hamilton Cty. Bd. of Revision* (1955), 163 Ohio St. 363, 56 O.O. 337, 127 N.E.2d 1, we stated in paragraph one of the syllabus, "Where a taxpayer asserts that functional depreciation should be considered in valuing his property for the purpose of taxation, the burden is upon the taxpayer to prove such depreciation." In order for Meijer to prove the dollar amount of the obsolescence which it alleged, the BTA had to accept its income approach. However, the BTA rejected Meijer's income approach and therefore Meijer was unable to prove the dollar amount of its alleged obsolescence. In paragraph two of the syllabus in *Rollman*, we held: "Where the only evidence as to functional depreciation is the opinion of the taxpayer's witness, which opinion the witness fails to substantiate with facts or figures, a decision of the Board of Tax Appeals that the taxpayer failed to sustain his burden of proof as to functional depreciation and excluding such

depreciation in valuation for tax purposes is neither unreasonable nor unlawful." The facts and figures which Meijer needed to prove obsolescence were rejected by the BTA; therefore, Meijer did not meet its burden of proof.

{¶ 27} Meijer contends further that the BTA has changed the concept of the cost approach from "cost is the upper limit of value" to "cost is the lower limit of value." We reject Meijer's argument. The only actual statement made by the BTA on the subject was that "the costs of purchase and construction evidence that a prospective purchaser was willing to pay at least the costs of the property as newly constructed." Meijer objects to the BTA's use of the words "at least," because it believes the BTA has stated that cost is now the lower limit of value, not the upper limit. We disagree with Meijer's interpretation of the BTA's remarks. We do not read the BTA's statement to mean that cost is the lower limit on value. The BTA's statement must be considered in the context of the BTA's decision. The statement in question followed statements by the BTA that "in *Dinner Bell Meats* [*Inc. v. Cuyahoga Cty. Bd. of Revision* (1984), 12 Ohio St.3d 270, 12 OBR 347, 466 N.E.2d 909], the Supreme Court acknowledged the applicability of the theory of substitution, that a knowledgeable buyer would pay no more for a property than the cost of producing a substitute property, and noted that such a theory was particularly applicable to new improvements which represent the highest and best use of the land. Such is the case herein." The BTA then stated, "Under the theory of substitution, this Board may safely assume that if a similar property existed which could have been purchased for less than the costs of construction, the appellant would have purchased such property." These statements by the BTA demonstrate its clear understanding of the theory of substitution set forth in the definition cited by this court in footnote one of *Dinner Bell Meats,* 12 Ohio St.3d at 272, 12 OBR at 349, 466 N.E.2d at 911, wherein we stated that the "'cost approach' has been defined as: "'That approach in appraisal analysis which is based on the proposition that the informed purchaser would pay no more than the

cost of producing a substitute property with the same utility as the subject property.'" "

{¶ 28} Meijer next contends that the BTA erroneously concluded that for functional obsolescence to exist the property must be useless or valueless to the owner. The BTA quoted paragraph two of the syllabus in *B.F. Keith Columbus Co. v. Franklin Cty. Bd. of Revision* (1947), 148 Ohio St. 253, 35 O.O. 244, 74 N.E.2d 359, which states, " Functional depreciation occurs where property, although still in good physical condition, has become obsolete or useless due to changing business conditions and thus for all practical considerations is of little or no value to the owner of such property." Meijer apparently interprets *B.F. Keith Columbus Co.* as requiring a showing that the entire property must be shown to be useless or valueless in order to prove functional obsolescence. A review of the BTA's opinion does not disclose such a drastic interpretation. The BTA reviewed Meijer's claim of obsolescence and found that Meijer had not supported its claim that the building was "too wide for its depth." The burden was on Meijer to prove obsolescence with facts and figures, *Rollman, supra,* and Meijer did not meet that burden.

{¶ 29} Meijer argues that the BTA must follow Ohio Adm.Code Chapter 5705-3 in determining true value. Ohio Adm.Code Chapter 5705-3 sets forth standard definitions and appraisal procedures to be followed by the county auditors in determining true value. Ohio Adm.Code Chapter 5705-3 may be used by the BTA as a reference for appraisal definitions and procedures, but it is neither directed to, nor binding on, the BTA. For instance, Ohio Adm.Code Chapter 5705-3 makes no provision for an owner of the property to give his opinion of value; however, such owner's opinion of value can be acceptable evidence for the BTA, *Amsdell v. Cuyahoga Cty. Bd. of Revision* (1994), 69 Ohio St.3d 572, 574, 635 N.E.2d 11, 13.

{¶ 30} Finally, Meijer again claims that the BTA adopted a value in use valuation and denied it equal protection. We again reject Meijer's argument. First,

we have found that the BTA's determination of true value was not based upon a value in use appraisal; therefore, Meijer's argument is based on an erroneous premise. Second, Meijer did not raise its claim of denial of equal protection in its Notice of Appeal before this court, and consequently, we have no jurisdiction to consider it. *Deerhake v. Limbach* (1989), 47 Ohio St.3d 44, 546 N.E.2d 1327.

{¶ 31} We find there is sufficient evidence to support the BTA's decision. Accordingly, the BTA's decision is neither unreasonable nor unlawful, and it is affirmed.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

WRIGHT, J., dissents.

_____